Filed 3/13/13  P. v. Green CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E054565 |
| v. | (Super.Ct.No. FSB1102089) |
| MATTHEW GREEN, | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Michael A. Smith, Judge.  (Retired judge of the San Bernardino Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Affirmed with directions.

Rebecca P. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Barry J.T. Carlton and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

1

Following a jury trial, defendant Matthew Green was convicted of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and being a felon in possession of a firearm (former § 12021, subdivision (a)(1) [now § 29800, subd. (a)(1) (Stats. 2010, ch. 711, § 6)]; count 2). The jury also made true findings on the associated enhancements (§§ 190.2, subd. (a)(22), 12022.53, subds. (b), (c), & (d), 190.03 [attached to count 1]). On September 20, 2011, the trial court sentenced defendant to state prison for life without the possibility of parole, plus 25 years to life for the section 12022.53, subdivision (d) enhancement; sentence on count 2 and the remaining enhancements was stayed.

On appeal, defendant contends: (1) the prosecutor violated his due process rights by withholding exculpatory evidence until the jury was in the middle of deliberations; (2) the prosecutor failed to correct materially false testimony by a witness; (3) the trial court erred in denying defendant's motion for new trial; (4) the trial court erred in failing to instruct the jury with CALCRIM No. 358; (5) the evidence was insufficient to support the gang enhancement allegation; (6) the trial court erred in failing to strike a witness's remarks; (7) the doctrine of cumulative error applies; and (8) this court should strike the parole revocation fine.

## I. PROCEDURAL BACKGROUND AND FACTS

On July 10, 2009, Jessica Lopez (Jessica) lived in an apartment complex on East Washington Street in Colton. That evening she had a party at her apartment, inviting her

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

coworkers and brothers, Arturo[2] and Alberto.  A Black male whom she nicknamed "Apartment Fool"[3] came to give Jessica some money he owed to her.  He came with another Black male, Chavis Russell (Russell).[4]  Later, a third Black male, nicknamed "Cocaine," arrived.  Separately, Saul Lopez Perez (hereinafter, the Victim) showed up with Jesus Orozco (Orozco), Edgar Santiago (Santiago),[5] and Josue Sanchez (Sanchez), Orozco's cousin.  Jessica's cousin, Jaime Lopez (Jaime), also came.  The partygoers drank beer, smoked marijuana, and walked in and out of Jessica's apartment.  At one point, Cocaine left the party and Russell stayed behind.

Approximately 10 minutes after Cocaine left, Jessica saw a group of Black males walking towards her apartment.  She believed one of them was Cocaine, because she remembered his white T-shirt.  As they approached, Jessica told Russell that he needed to go and talk to the group because it "wasn't that kind of party."  As Russell walked towards the group, Jessica told everyone to go back inside the apartment because she did not feel right about the situation.  When Russell contacted Cocaine and the other males, about 20 feet away, they all looked towards the direction of Jessica's apartment.  Jessica joined everyone inside.

Upon learning that Santiago was not in the apartment, the Victim went outside to look for him and Jessica followed, stopping at the edge of her patio.  The Victim walked

---

[2] Arturo Lopez Espinoza.
[3] He was also identified as "B."
[4] Chavis Russell is also known as "True-Dat."
[5] Edgar Santiago is also known as "Green Eyes."

3

up to the group of Black males and asked if they had seen Green Eyes. As he approached, Cocaine lifted his white T-shirt, pulled out a gun, and shot the Victim. Jessica heard more shots after the Victim fell to the ground. Lights from the apartment lit the area. Jessica ran back inside her apartment, locked the door, and screamed, "Saul is shot. Saul is shot."

When Jessica, Arturo, Orozco, Sanchez, and Jaime went outside to the Victim, his eyes were rolling back and he was attempting to breathe. The police arrived approximately 10 to 15 minutes later. Jessica spoke with them at the police station later that night. She said she had seen the shooting but only knew the shooter's name was Cocaine because her brothers told her. They also told her about Cocaine's tattoos. She described the shooter as being short with a medium build. Defendant is five feet seven inches tall. Initially, Jessica testified that defendant resembled Cocaine, the shooter, i.e., he was about the same height, same build, and same clothing. However, she later stated that she was positive defendant was the shooter. Jessica acknowledged having a prior felony conviction for possession of narcotics for sale.

Colton Police Homicide Detective Robert Wilson spoke with Jessica in the early morning hours of July 11, 2009. Officers arriving earlier had separated Jessica and other witnesses. Jessica told the detective that she was right behind her cousin when defendant shot him. She met defendant earlier in the evening. She said he had "some teeth that were messed up or gone." In fact, a photograph of defendant shows several of defendant's bottom teeth are missing. At the police station Jessica circled another person's photograph in a photographic lineup but stated she could not be sure he was the

4

shooter. She received a phone call after the photographic lineup informing her the Victim had died.

Various guests at the party and neighbors testified. Russell testified that he lived in the same apartment complex on East Washington with his fiancée and seven-year-old son. On July 10, 2009, he went to Jessica's party between 10 and 10:30 p.m. with a Black male acquaintance known as "B." Russell drank and smoked marijuana. "B" left the party 35 to 40 minutes later. Defendant, who was known as "Cane" or "Cocaine," arrived alone about an hour after Russell. Russell and defendant talked and drank beer. A new group of Hispanics arrived about 20 or 30 minutes after defendant's arrival. Russell was inside Jessica's apartment when they arrived; defendant was outside. When Russell went back outside, he saw a gang confrontation between defendant and the Hispanics, in which both sides were displaying their tattoos and stating where they were from. Jessica and Russell assisted others in defusing the situation. Defendant left the party but Russell stayed.

About 45 minutes later, as Russell was leaving the party, he saw defendant talking to three other Black males in the apartment complex. Jessica had asked Russell to tell the group that she had enough people at her house and she did not want any trouble. When Russell relayed Jessica's message, defendant replied, "'Fuck those Esses.'" Russell recalled that one of the three Black males wore white, like defendant, while the others wore black. He testified that defendant and one of the males wore baseball caps.

As Russell was walking away from defendant, he saw one of the Hispanic males from the party approaching defendant's group. Defendant walked up to the Hispanic

5

male,[6] pulled a gun from his waistband, shot the Hispanic male in the head area, and then shot him three more times after he fell to the ground. Russell froze briefly and then ran back to his own apartment. Because Russell continually expressed concerns for his and his family's safety, Detective Wilson contacted the district attorney's victim/witness relocation program in order to move them out of the apartment complex.

Jessica's brother, Arturo, recalled seeing three Black males at the party, but initially testified that he did not see any of those men in court. Arturo described one of the Black males as wearing a white T-shirt, black hat and pants, and missing two bottom teeth. Arturo identified the person in photograph No. 4 of Exhibit 76 as a person he had met at the party, who had a "Compton Watts Life" tattoo. According to Arturo, this same person (defendant) asked the Victim, Jaime and Santiago, "Where are you guys from," to which they replied they were not involved with a gang but were from Fontana. Defendant showed his tattoos, saying "This is the Watts life." After Russell told defendant this was not their house, he apologized.[7]

Later, defendant approached Santiago in an aggressive manner. Defendant again said, "This is Watts life, homie." When the confrontation ended, defendant shook Santiago's hand in an aggressive manner and gave him an angry look. After the two separated, defendant left.

---

[6] There was enough lighting for Russell to recognize defendant.

[7] Although Arturo did not identify defendant, Arturo described him as having tattoos on his hand and saying, "This is the Watts life." Defendant was described as having tattoos on his arms that said "Watts" or "Compton Life."

Santiago left the party because he had a bad feeling about the situation. Arturo stayed outside the apartment with Jaime. The Victim was standing by the door near the entrance of the apartment building, and Sanchez and Orozco went back inside the apartment. Arturo later went back inside the apartment when Jessica advised everyone to do so. The Victim asked Arturo, "What's wrong?" and then walked outside. Arturo followed the Victim and Jessica outside, saw the three Black males about 30 feet away, saw one Black male pull out a chrome object, and then saw sparks fly as the Victim went down. Arturo testified that the shooter was the only Black male wearing a white T-shirt and a black hat. However, Jessica testified that Arturo had gone inside the house with everyone when she told them to do so. Arturo acknowledged felony convictions for burglary and for obstructing a police officer.

Defendant was described as having a medium build, wearing a white T-shirt, dark pants, a baseball cap, having a goatee, tattoos on his hand and arms, and bottom teeth missing.

Sanchez testified that when he and his Hispanic friends arrived at the party, he noticed defendant and a taller Black male staring at them with strange expressions on their faces, as if wondering "[w]hat are they doing here?" Orozco testified that when he shook defendant's hand, defendant identified himself as Cocaine and he was from Compton. Orozco overheard defendant say, "'Yeah, I just put my strap [gun] away'" and he then said, "'I just got done dumping on some fools.'" A few minutes later, Orozco saw defendant and Santiago confronting each other by the walkway outside the apartment. Orozco approached them and said, "'Hey, you know what, we're here to

7

party.  We're here to have a good time.  We're not here to start nothing.'"  The Victim also helped stop the confrontation.  The two walked away in separate directions.

According to Orozco, shortly thereafter he and the Victim went looking for Santiago.  Upon returning to the party, Orozco noticed that defendant had also returned.  Orozco and Sanchez both testified that Jessica told everyone to get inside.  Within three minutes, Orozco and Sanchez heard three successive gunshots and Orozco dropped to the floor.  The two went outside and saw the Victim lying on the ground with injuries to his head.  They both later selected defendant's photograph from a photographic lineup as the man who called himself Cocaine at the party.  Orozco acknowledged prior felony convictions including a 2006 conviction for second degree burglary.

Santiago testified that he associated with South Fontana and the "I.E."  He acknowledged felony convictions in 2007 for child endangerment and evading police.  He recalled that shortly after arriving at Jessica's party with his friends, he was confronted by defendant.  Before the confrontation, defendant stared at Santiago, who stared back.  Santiago described defendant as a Black male who was a little thinner and taller than he.  Santiago was five feet five or five feet six inches tall.  Defendant is in fact five feet seven inches tall.

Santiago asked defendant, "'What's up?'" and defendant replied with words like, "'What's up, homie?'" and "'I'm Cocaine from Compton.'"  Defendant appeared to throw a gang sign when he identified himself.  Santiago replied, "'I'm Green Eyes from South Fontana.'"  After this exchange, Santiago believed the two would have to fight.  They got within two or three feet of each other when Orozco and the Victim intervened.

8

They shook hands; however, defendant held onto Santiago's hand for a few seconds after Santiago attempted to let go. Santiago described it as a territorial gesture, "like, you know, '[j]ust know where I'm from . . . what I'm about.'" Defendant then walked right past Santiago before walking away with another Black male.

Santiago watched the men walk away. Concerned that defendant would come back with a gun "Rambo-style" and start shooting, Santiago told his friends they should leave and warned, "'He's going to pop off. Someone is going to come back with a strap.'" His friends did not listen to him, so Santiago left the party alone.

Christina Lausterer, who lived in an upstairs apartment from Jessica's apartment, saw four Black males walking in front of the apartment after 1:00 a.m. She heard one of the men say, "'Hey . . . did you hear? . . . We're killing Mexicans.'" Her husband, Alexander, recalled that the man who spoke had a medium build and a "kinda deep" voice. At that point, a Hispanic male walking from the area of Jessica's apartment approached the four men and asked the one who had said they were killing Mexicans, "'Hey, where's Green Eyes?'" The Black man took a few steps back, pulled out a gun from under his shirt and aimed it at the Hispanic male's neck. The man with the gun was wearing a white T-shirt and jeans. Alexander believed the gun was a chrome revolver and the Black man was a little shorter than the Hispanic man. As Alexander pushed Christina back, she heard three gunshots. When they went back on the balcony, they saw a group of people gathering around the Hispanic male's body.

Neither Christina nor Alexander was able to pick defendant out of a photographic lineup. However, Alexander acknowledged that he did not want to testify because he was afraid he would be assaulted if he talked to the police about what he had seen.

Darryl Prudholme, another tenant in the apartment complex, also did not want to testify. However, in an interview with Sergeant Steve Davis on July 16, 2009, Prudholme stated he heard gunshots around 1:00 a.m. on July 11 and then saw defendant running to a nearby upstairs apartment with two other Black males. Prudholme recalled that on a prior occasion, defendant said he owned a .357 Magnum revolver.

An autopsy of the Victim was performed. His wounds suggested he was shot in the neck at close range. The shooter then fired two more times while standing over the Victim as he lay on the ground. The Victim died from gunshot wounds to the head and neck. One of the bullet fragments recovered from the body could have been fired from a .357 Magnum or a .38-caliber special revolver.

On July 11, 2009, at approximately 11:00 a.m., officers entered defendant's apartment and located an identification card with defendant's name, a black baseball cap with the letters "CA," and a T-shirt in the dirty clothes hamper. Detective Wilson determined that defendant's wife and four children also lived at the apartment. The officers surveilled the apartment for approximately one month; however, defendant never returned to it. The officers looked for defendant without success until defendant was arrested in Las Vegas on February 17, 2010.

Photographs of defendant taken on February 25, 2010, showed that some of his bottom teeth were missing and that he had several tattoos on his chest and arms,

10

including, "CAC" (Compton Avenue Crips), Big "C," a large "A," a person's name with "RIP" under it, and "Watts life." In both 2007 and 2009, defendant admitted his gang membership in the Compton Avenue Crips to a Los Angeles (L.A.) County sheriff's detective and L.A. police officers. L.A. Police Officer Timothy Colson, a gang expert, described the Compton Avenue Crips as a criminal street gang in Watts. The letters "CA" stand for Compton Avenue. Compton Avenue Crips wear old California Angel's caps that portray the lettering "CA." Crips will fight Hispanic gangs when their business or their reputation is threatened. If a Hispanic gang member "disrespects" a Compton Avenue Crip, gang reprisal will follow. A racial slur could symbolize such disrespect. Members benefit their gang by retaliating against anyone who disrespects the gang and letting everyone know one is from the gang. Regardless of the neighborhood, if a Compton Avenue Crip is disrespected or confronted by a Hispanic male, the gang member must retaliate.

San Bernardino Police Officer and gang expert Jason Heilman explained the tension between L.A.-based Black gangs and Inland Empire (I.E.)-based Hispanic gangs when L.A. Black gang members "gang-bang" around the turf of the I.E. Hispanic gangs. Feuds between these two ethnic groups start in prison and then surface with murders and shootings on the streets. If a gang member feels his gang is being disrespected, he has the responsibility of retaliating with violence in order to back up his gang. A racial slur from an I.E. Hispanic gang member can trigger violent retaliation from an L.A. Black gang member for the purpose of benefitting the gang by enhancing its, as well as the member's, reputation. A violent reputation enables the gang to take over neighborhoods

11

and street corners through the intimidation of the public and rival gangs. It also makes potential witnesses less likely to cooperate with law enforcement because of the witnesses' fear for themselves and their families. Failing to retaliate with violence weakens the reputation of the gang.

In order to conceal defendant's status as a convicted felon, the parties stipulated that he is legally prohibited from possessing a firearm.

## II. *BRADY*[8] VIOLATION

Defendant faults the prosecutor for failing to turn over *Brady* material until the jury was in the middle of deliberations. He contends the key witness who identified him as the shooter, namely, Chavis Russell, was provided relocation benefits, did not come forward to identify defendant until he was told that he would be charged with murder, and lied about his employment status at the time of the shooting. Thus, defendant argues his due process rights were violated by the prosecutor withholding the amount of relocation benefits provided.

### A. Further Background Facts

On July 29, 2011, defense counsel e-mailed the prosecutor requesting information on the amount of relocation benefits provided to Russell. The prosecutor forwarded the request to the people in his office in charge of such information. The information was not received prior to Russell taking the witness stand, and thus, on August 2, defense counsel questioned him regarding the money paid by the prosecution for his relocation.

---

**8** *Brady v. Maryland* (1963) 373 U.S. 83 [83 S.Ct. 1194, 10 L.Ed.2d 215] (*Brady*).

12

Russell testified that it was no more than approximately $600. On redirect, Russell explained that he and his family had stayed in a hotel for two months and that the district attorney's office had paid the hotel. Outside the presence of the jury and following the commencement of redirect examination of Russell, the prosecutor informed the court that he had requested the information via e-mails and had copied defense counsel on the e-mails. He explained that relocation payments are "done separately from [him], and it's centralized just in one part of [the] office. And there's only one particular person that maintains that information, because of confidentiality reasons." Although the prosecutor had not yet received the pertinent information, he volunteered to have someone come to court to testify regarding the amounts paid in the event he could not get a printout.

Jury deliberations began at 3:52 p.m. on August 8, 2011, prior to receipt of any printout or report. Defendant did not request a continuance to obtain the missing expense account report. In a chambers conference held at 10:33 a.m. on August 10, defense counsel informed the court that she had received the breakdown report dated August 9 and that she wanted to reopen the case in order to introduce the printout/report into evidence. According to the August 9 report, in exchange for his trial testimony, from July 16, 2009, to present, Russell received $13,712, comprised of $11,406 for temporary lodging, $1,625 for meals, $476 for incidentals, $125 for a U-Haul truck rental and gasoline, and $80 for a storage unit.

Following further discussions, on August 10, 2011, the parties stipulated that the court could advise the jury about the relocation benefits provided. The court called the jury back into the courtroom and stated: "During Mr. Russell's testimony, he testified

13

that the victim/witness program relocated him to another location, testified that they put him up in a hotel for a couple of months. That they paid the hotel, and then they relocated him to an apartment and they paid something towards that, and you know, some other small amounts, is what he testified to. [¶] Both sides were trying to get the actual record of how much he was paid. They didn't have that during the course of his testimony. They did receive it now. So, rather than reopening the trial to call those people to come in and testify, the parties have stipulated that I can give you the following information as to the amounts of money that were paid by the victim/witness program for relocation of Mr. Russell. [¶] For temporary lodging, the program paid a total of $11,406. [¶] For meals, the program paid a total of $1625. [¶] For incidentals, the program paid a total of $476. [¶] For a U-Haul truck rental and gasoline, the program paid $125. [¶] And for a storage unit, the program paid $80. [¶] For a total of $13,712. [¶] And you should regard that as part of the evidence in the case, the same as if those people came in and testified to that information." The court further informed the jury that Russell's participation in the program ended in 2009. The jury resumed deliberations and then later that day reached its verdict.

Prior to sentencing, defendant moved for a new trial on the grounds the prosecution failed to provide the accounting of the witness protection benefits provided to Russell until the second day of jury deliberations. Denying the motion, the trial court stated: "With regard to the evidence as to the amount that was paid to the one witness in witness protection, that was potentially important evidence, especially after that witness testified that his expenses were relatively minimal. I think he said they paid for a hotel

14

for a little while, some meals.  He definitely tried to minimize that.  When the actual evidence, the report came out, it was substantially more than what he led people to believe.  The defense did get the benefit of that evidence by having the jury hear that evidence.  And, as pointed out by the prosecution, they got it without the benefit of the witness explaining or saying, 'I didn't realize it was that much,' or whatever.  And without the prosecution being able to attempt to explain it.  So, I think the defense got the benefit of that evidence.  The fact it was late did not prejudice the defense."

### B.  Standard of Review

We independently review the question whether a *Brady* violation has occurred, while giving great weight to any trial court findings of fact that are supported by substantial evidence.  (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 176.)

### C.  Analysis

In *Brady*, the United States Supreme Court established that due process requires the prosecution to disclose to the defense evidence that is both favorable to the defendant and material on either guilt or punishment.  (*Brady*, *supra*, 373 U.S at p. 87.)  "Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses.  [Citation.]"  (*In re Sassounian* (1995) 9 Cal.4th 535, 544.)  This includes evidence that reflects upon the credibility of material witnesses.  (*Giglio v. United States* (1972) 405 U.S. 150, 154-155; *People v. Ruthford* (1975) 14 Cal.3d 399, 408, overruled on another ground in *In re Sassounian*, *supra*, at pp. 545-546, fn. 7.)  Evidence is "material" for purposes of *Brady* "'only if there is a reasonable probability that, had [it] been disclosed to the defense, the result . . . would have been different.'

15

[Citations.]" (*In re Sassounian, supra,* at p. 544.) Such a reasonable probability exists where the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles v. Whitley* (1995) 514 U.S. 419, 435, fn. omitted; see also *In re Williams* (1994) 7 Cal.4th 572, 611.) "'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 829.) The defendant has the burden of showing materiality. (*People v. Hoyos* (2007) 41 Cal.4th 872, 918.)

The prosecutorial obligation to disclose relevant materials in the possession of the prosecution includes information within the possession or control of the prosecution or to which the prosecutor has reasonable access. (*In re Littlefield* (1993) 5 Cal.4th 122, 135.) The duty of disclosure "is not limited to evidence the prosecutor's office itself actually knows of or possesses, but includes 'evidence known to the others acting on the government's behalf in the case, including the police.' [Citation.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1132, overruled on other grounds as stated in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

In order to establish a violation of *Brady*, the "evidence must have been suppressed by the State . . . ." (*Strickler v. Greene* (1999) 527 U.S. 263, 282.) Our state Supreme Court has stated that "evidence that is presented at trial is not considered suppressed, regardless of whether or not it had previously been disclosed during discovery. [Citations.]" (*People v. Morrison* (2004) 34 Cal.4th 698, 715.) However,

16

courts have also held that the disclosure of *Brady* material "'must be made at a time when the disclosure would be of value to the accused.' [Citation.]" (*People v. Superior Court (Meraz)* (2008) 163 Cal.App.4th 28, 51.)

Defendant contends his due process rights were violated by the prosecution withholding the amount of relocation benefits provided to Russell. As explained, we hold there was no violation of the prosecution's duties under *Brady*.

Prior to his testimony, defense counsel was aware that Russell was provided relocation benefits. On July 29, 2011, she requested a printout of the total benefits and the prosecutor forwarded her request to the people in possession of it. The People acknowledge that defense counsel did not receive the information in a timely basis; however, the fact that Russell received relocation benefits was presented to the jury. Arguably, there was no suppression of evidence and therefore, no *Brady* violation. Nonetheless, defendant asserts the report was provided too late to use during her cross-examination of Russell and in closing argument. Although the information was disclosed very late in the trial, defendant did not request a continuance or attempt to reopen the case and recall Russell to question him about the benefits he received. We cannot know, therefore, whether it was too late to examine Russell on the matter.

Nor is it clear whether the fact that Russell received more benefits in the witness protection plan than he disclosed is favorable to defendant. Russell testified that he feared for the safety of himself and his family and was thus offered relocation benefits. The fact that a person is given the protection offered by the program implies that someone believed that Russell was at risk of being harmed because of his involvement in

17

this case. This fact, by itself, does not appear to reflect negatively upon Russell's credibility or be otherwise favorable to defendant. (Compare *U.S. v. Davis* (5th Cir. 2010) 609 F.3d 663, 696 [information that witness was offered witness protection was not favorable to defendant because jury may have assumed that the witness needed protection from the defendant] with *U. S. v. Talley* (6th Cir. 1999) 164 F.3d 989, 1003 [relocation benefit for key government's witness must be disclosed].)

Nonetheless, defendant asserts that Russell's "credibility was absolutely central to the jury's verdict in this case," because he was the "only witness to definitively identify [defendant] as the shooter." However, as the People point out, defendant received the benefit of the report when the trial court read it to the jurors, who could then consider the discrepancy between the witness's testimony about the relocation amounts he received and the actual amounts he received. Although defense counsel was not able to present the report during her cross-examination of Russell, she did impeach him with the lies he previously told police officers and defense counsel, with his acknowledgment that he was intoxicated on the date of the events leading to the shooting, and with his juvenile arrest for shoplifting.

The trial court instructed the jurors on how to treat Russell's testimony. If they decided he was an accomplice in the charged crime, then they needed to view his testimony with caution and could not convict defendant on Russell's testimony alone. (CALCRIM No. 334.) Thus, defense counsel vehemently argued that Russell was a more likely shooting suspect than defendant, and his testimony should not be believed. Given the state of the evidence before this court, it is not reasonably likely that, had defense

18

counsel cross-examined Russell with the report of the actual amount of benefits he received, such cross-examination would have impacted his credibility in a meaningful way or affected the result at trial. Therefore, based upon the circumstances present here, such information was not material for purposes of *Brady*.

### III. PROSECUTION'S FAILURE TO CORRECT WITNESS'S TESTIMONY REGARDING RELOCATOIN BENEFITS RECEIVED

"A prosecutor's presentation of knowingly false testimony [citation], or the failure to correct such testimony after it has been elicited [citation], violates a defendant's right to due process of law under the United States Constitution. [Citations.]" (*People v. Vines* (2011) 51 Cal.4th 830, 873.) Defendant contends the prosecutor violated *Napue v. Illinois* (1959) 360 U.S. 264, 269 (*Napue*), by failing to correct Russell's false testimony regarding the relocation benefits he received. According to defendant, because the district attorney's office had the information showing that Russell testified falsely about the value of the benefits he received, "the presentation of that false evidence was 'knowing' under *Napue*." As we explain, no due process violation occurred.

The prosecutor did not fail to correct Russell's false testimony. Upon redirect, the prosecutor brought out the information that Russell, along with his family, was moved into a hotel for a few months and that the cost of the hotel was paid by the district attorney's office. Immediately upon receipt of the report detailing the amount of benefits received, the prosecutor provided it to defense counsel. He did not object to the report being given to the jury, or stipulating to the amounts actually spent. Rather, his only concern was that Russell never really knew exactly how much was paid for the hotel. On

19

this record, defendant has failed to establish that the prosecutor presented false testimony or failed to correct such testimony. Accordingly, no due process violation occurred.

## IV. DENIAL OF MOTION FOR NEW TRIAL

Based on the reasons set forth in the about two arguments, defendant contends the trial court abused its discretion in denying his motion for new trial. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 125} Because we have found no merit to either argument, we find no merit his challenge to the denial of his motion for new trial.

## V. CALCRIM NO. 358

Next, defendant asserts the trial court erred in failing to give the jury CALCRIM No. 358, which instructs the jurors to review defendant's out of court statements with caution.

### A. Further Background Facts

According to Darryl Prudholme, another tenant in the apartment complex, defendant said he owned a .357 Magnum revolver. However, defendant claims that Prudholme recanted this statement when he testified, "I don't know who Green is." Orozco testified that when defendant arrived at the party, he said, "'Yeah, you know, I just got done putting my strap away. I just got done dumping on these fools.'" However, defendant asserts that Orozco never made this statement to police.

### B. Standard of Review

"It is well established that the trial court must instruct the jury on its own motion that evidence of a defendant's unrecorded, out-of-court oral admissions should be viewed with caution. [Citations.]" (*People v. McKinnon* (2011) 52 Cal.4th 610, 679

20

(*McKinnon*); see also Judicial Council of Cal., Crim. Jury Instns. (2012) Bench Notes to CALCRIM No. 358, p. 133.) "The purpose of the cautionary language . . . is to assist the jury in determining whether the defendant ever made the admissions. [Citations.]" (*McKinnon*, *supra*, at p. 679.)

## C. Analysis

CALCRIM NO. 358 provides: "You have heard evidence that the defendant made [an] oral or written statement[s] (before the trial/while the court was not in session). You must decide whether the defendant made any (such/of these) statement[s], in whole or in part. If you decide that the defendant made such [a] statement[s], consider the statement[s], along with all the other evidence, in reaching your verdict. It is up to you to decide how much importance to give to the statement[s]. [¶] [Consider with caution any statement made by (the/a) defendant tending to show (his/her) guilt unless the statement was written or otherwise recorded.]"

We will assume, without deciding, that the trial court erred in failing to instruct the jury with CALCRIM No. 358. "In determining whether [this particular] failure to instruct requires reversal, '[w]e apply the normal standard of review for state law error: whether it is reasonably probable the jury would have reached a result more favorable to defendant had the instruction been given.' [Citations.]" (*McKinnon*, *supra*, 52 Cal.4th at p. 679.) The People argue the error was harmless.

""""Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any

21

conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately. [Citations.]"' [Citations.] [The California Supreme Court] has held to be harmless the erroneous omission of the cautionary language when, in the absence of such conflict, a defendant simply denies that he made the statements. [Citation.] Further, when the trial court otherwise has thoroughly instructed the jury on assessing the credibility of witnesses, [it has] concluded the jury was adequately warned to view their testimony with caution. [Citation.]" (*McKinnon*, *supra*, 52 Cal.4th at pp. 679-680.)

Here, the jury was otherwise fully instructed on how to evaluate the testimony of witnesses. It was given CALCRIM Nos. 220 (Reasonable Doubt); 226 (Witnesses); 301 (Single Witness's Testimony); 302 (Evaluating Conflicting Evidence); 315 (Eyewitness Identification); 316 (Additional Instructions on Witness Credibility—Other Conduct); and 318 (Prior Statements as Evidence). Thus, much as in *People v. Dickey* (2005) 35 Cal.4th 884, 906, distinguished on other grounds in *People v. Sanchez* (2011) 53 Cal.4th 80, 91, "[t]he jury was instructed on the significance of prior consistent or inconsistent statements of witnesses, discrepancies in a witness's testimony or between his . . . testimony and that of others, witnesses who were willfully false in one material part of their testimony being distrusted in other parts, weighing conflicting testimony, evidence of the character of a witness for honesty and truthfulness to be considered in determining the witness's believability, and was given a general instruction on witness credibility that listed other factors to consider, including a witness's bias, interest or other motive, ability to remember the matter in question, and admissions of untruthfulness." The jury was also

22

instructed to "carefully review all the evidence" before concluding that the testimony of any one witness proved any fact. (CALCRIM No. 301.) Finally, the jury was instructed: "You have heard evidence of statements that a witness made before the trial. *If you decide that the witness made those statements*, you may use those statements . . . [¶] [t]o evaluate whether the witness's testimony in court is believable . . . ." (CALCRIM No. 318, italics added.) The same applies if the witness testified to something, but failed to give a statement about it.

Turning to the record before this court, we note defendant made more of the statement of Prudholme and the testimony of Orozco than the prosecution did. Their comments regarding defendant's ownership of a .357 Magnum were not brought up in the prosecutor's closing argument. Rather, it was defense counsel who noted that forensics failed to confirm the bullets were fired from a .357 Magnum, which Prudholme claimed defendant said he owned. The prosecutor replied by noting that Prudholme's statement was given prior to forensics testing. No mention was made of Orozco's testimony regarding defendant's claim of ownership of a gun. Clearly, the evidence of defendant's claim did not play a significant role in convicting defendant. Nonetheless, even if there had been no evidence of defendant's out-of-court statement that he owned a .357 Magnum, the case against him was strong. Defendant was identified as the person at the party who proudly displayed and identified himself as a gang member. When confronted with a gang member from a different gang, defendant did not back down. Rather, he held his ground until forced to part. Even after defendant left the party, he returned armed and ready to kill Mexicans. The rival gang member left in order to avoid any gang

23

confrontation. There were several witnesses who identified defendant as the shooter. Given the independent evidence of defendant's guilt, it does not seem reasonably probable that a properly instructed jury would have rejected either Orozco's testimony or Prudholme's statement and returned a different verdict.

## VI. EVIDENCE OF GANG ENHANCEMENT ALLEGATION

Defendant challenges the sufficiency of the evidence supporting imposition of the special circumstance under section 190.2, subdivision (a)(22). He specifically argues the evidence was insufficient to show he (1) intended to further the gang's activities, (2) actively participated in the gang at or near the time of the murder, and (3) knew the gang's members engaged in a pattern of criminal activity.

### A. Standard of Review

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

### B. Analysis

"Section 190.2, subdivision (a)(22), was enacted as part of Proposition 21, the Gang Violence and Juvenile Crime Prevention Act of 1998, an initiative measure adopted by the electorate in March 2000. [Citation.] Statements contained in Proposition 21

24

reflect its intent: "'Gang-related crimes pose a unique threat to the public because of gang members' organization and solidarity. Gang-related felonies should result in severe penalties. *Life without the possibility of parole or death should be available for murderers who kill as part of any gang-related activity.*'" [Citations.]" (*People v. Carr* (2010) 190 Cal.App.4th 475, 485 (*Carr*).)

CALCRIM No. 736, as given by the court in this case, provides: "The defendant is charged with the special circumstance of committing murder while an active participant in a criminal street gang in violation of Penal Code section 190.2[, subdivision] (a)(22). [¶] To prove that this special circumstance is true, the People must prove that: [¶] 1. The defendant intentionally killed [the Victim]; [¶] 2. At the time of the killing, the defendant was an active participant in a criminal street gang; [¶] 3. The defendant knew that members of the gang engage in or have engaged in a pattern of criminal gang activity; [¶] AND [¶] 4. The murder was carried out to further the activities of the criminal street gang. [¶] Active participation means involvement with a criminal street gang in a way that is more than passive or in name only. [¶] The People do not have to prove that the defendant devoted all or a substantial part of his time or efforts to the gang, or that he was an actual member of the gang. [¶] It has been stipulated that the Compton Avenue Crips is a criminal street gang within the meaning of this instruction."

Although the language in section 190.2, subdivision (a)(22) differs from the gang enhancement described in section 186.22, subdivision (b)(1), defendant contends the court "should find that the language in section 190.2[, subdivision] (a)(22) more closely

25

mirrors that of [section] 186.22[, subdivision] (a) than that of [section] 186.22[, subdivision] (b) and should also find that the special circumstance only applies when the evidence show[s] some intent or effort to further the gang's criminal activities . . . ."

Section 190.2, subdivision (a)(22) authorizes a defendant to be sentenced to "death or imprisonment in the state prison for life without the possibility of parole," if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." Section 186.22, subdivision (b)(1) mandates a sentence enhancement when the underlying felony was "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ."

The language in section 190.2, subdivision (a)(22) is clear. It does not incorporate subdivision (a) of section 186.22, which defines the substantive criminal offense of active gang participation. Rather, it incorporates subdivision (f) of section 186.22, the subdivision that defines the term "criminal street gang." (*Carr*, *supra*, 190 Cal.App.4th at p. 487.) Nonetheless, the language in section 190.2, subdivision (a)(22), which requires the People to prove "the murder was carried out to further the activities of the criminal street gang," "substantially parallels the language of section 186.22, subdivision (b)(1), which authorizes a sentencing enhancement for felonies 'committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'"

26

(*Carr*, *supra*, at p. 488.) As demonstrated below, the evidence was sufficient to support imposition of the special circumstance under section 190.2, subdivision (a)(22).

It was stipulated that the Compton Avenue Crips is a criminal street gang. Defendant admitted he was a member in this gang. He displayed tattoos that proclaimed the Compton Avenue Crips. The Compton Avenue Crips was described as a criminal street gang in Watts whose members wear old California Angel's caps portraying the lettering "CA." The gang will fight Hispanic gangs when their business or reputation is threatened, or when the gang has been disrespected. Letting people know that one is from the gang enhances the gang's respect and therefore benefits the gang and a gang member. A Compton Crip does not sever his gang affiliation by moving out of Compton. Rather, he shows his gang affiliation by claiming the gang in front of others.

Gang expert Jason Heilman explained the tension between L.A.-based Black gangs and I.E.-based Hispanic gangs when an L.A. gang member "gang-bangs" around the turf of the I.E. gang. A racial slur from an I.E. gang member can trigger violent retaliation from an L.A. gang member for the purpose of benefitting his gang by enhancing its reputation along with the member's reputation. Not retaliating weakens the gang's reputation. In contrast to a weak reputation, a strong or violent reputation allows the gang to take over neighborhoods through intimidation. It also makes potential witnesses less likely to cooperate with law enforcement due to their fear for themselves and their families. Many of the prosecution witnesses expressed fear of testifying at defendant's trial.

Turning to defendant's actions on the night of the murder, we note he introduced himself as Cocaine and stated where he was from. He specifically asked the Hispanic males where they were from. He displayed his tattoos, was described as gang-banging one of the Hispanic males, and when shaking his hand, defendant did so in an aggressive manner, giving an angry look. Both defendant and the Hispanic male left the party. The Hispanic male left because he believed defendant would come back and "pop off." He was correct. Defendant left the party only to return with other Black males and a gun. When Russell walked up to defendant and told him that Jessica did not want any trouble at the party, defendant replied, "Fuck those Esses." He was heard saying they were going to kill Mexicans, and as soon as the Victim walked up to ask about the location of a friend, defendant pulled out his gun and killed him.

"[E]vidence that allows a jury to find a felony was committed for the benefit of a gang within the meaning of section 186.22, subdivision (b)(1), also typically supports a finding the defendant knew of the criminal activities of the gang. The Supreme Court has observed, 'the facts from which a mental state may be inferred must not be confused with the mental state that the prosecution is required to prove. Direct evidence of the mental state of the accused is rarely available except through his or her testimony. The trier of fact is and must be free to disbelieve the testimony and to infer that the truth is otherwise when such an inference is supported by circumstantial evidence regarding the actions of the accused.' [Citation.] In other words, just as a jury may rely on evidence about a defendant's personal conduct, as well as expert testimony about gang culture and habits, to make findings concerning a defendant's active participation in a gang or a pattern of

28

gang activity, it may also rely on the same evidence to infer a defendant's knowledge of those activities. [Citation.]" (*Carr*, *supra*, 190 Cal.App.4th at pp. 488-489, fn. omitted.)

Considering the record before this court, there was ample evidence that at the time of the killing, defendant was an active participant in a criminal street gang; he knew the members of the gang engaged in or have engaged in a pattern of criminal gang activity; and he intentionally killed the Victim in order to further the activities of a criminal street gang.

## VII. FAILURE TO STRIKE WITNESS'S REMARKS

The prosecution questioned Santiago regarding his reasons for leaving the party immediately following his confrontation with defendant. The following exchange occurred:

"Q  Why did you leave?

"A  The reason I left was because [defendant] had left. He went in that direction, to my right. And I noticed the apartment complex was filled with Black African-Americans, and just a lot of movement going on. And, you know, being from the streets, you kinda get that feeling like, 'Oh, you know, something is going to go down.' And I'm telling my friends, 'He's going to pop off. Someone is going to come back with a strap.'

"[DEFENSE COUNSEL]:  Objection, your Honor, to those statements as being conclusions.

"THE COURT:  Overruled.

"Q  (By [The Prosecutor])  So, you were telling your friends, basically, you didn't feel comfortable staying?

29

"A   Yes, I had a feeling that he was going to come back and he's going to start coming back Rambo-style, coming with a gun and shooting at us.

"[DEFENSE COUNSEL]:  Objection, your Honor.

"THE COURT:  Overruled.  It goes to his state of mind and to explain his subsequent actions."

On appeal, defendant contends the trial court erred in failing to strike Santiago's remarks because they "were unsupported conclusions and speculative, inflammatory comments that were not relevant to any issues in the case."  He argues they "improperly suggested that [Santiago] had some knowledge [defendant] was a violent person with a criminal disposition," and they should have been stricken.

## A.  Standard of Review

"When an objection to evidence is raised under Evidence Code section 352, the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption. Unless these dangers 'substantially outweigh' probative value, the objection must be overruled.  [Citation.]"  (*People v. Cudjo* (1993) 6 Cal.4th 585, 609; see also *People v. Kipp* (2001) 26 Cal.4th 1100, 1121.) "'[P]rejudicial' is not synonymous with 'damaging,' but refers instead to evidence that '"uniquely tends to evoke an emotional bias against defendant"' without regard to its relevance on material issues.  [Citations.]"  (*People v. Kipp*, *supra*, at p. 1121.)  "On appeal, the ruling is reviewed for abuse of discretion.  [Citation.]"  (*People v. Cudjo*, *supra*, at p. 609.)

**B. Analysis**

Santiago's beliefs about whether defendant would return and "pop off," if offered as evidence of defendant being a violent person with a criminal disposition who would actually return and pop off, could be excluded as speculation. (See Evid. Code, § 702, subd. (a) [witness's testimony must be based on personal knowledge], and § 800, subd. (a) [lay opinion must be rationally based on the perception of the witness].) These same beliefs, however, if offered to prove Santiago's state of mind, were not speculation. After all, Santiago had personal knowledge of his own beliefs. Moreover, as the People argue, Santiago's testimony as to why he left the party illustrates his fear which was an issue in the case. The purpose of gang-banging others is to intimidate them. "[Defendant's] acts of intimidating partygoers like [Santiago] up to and including the shooting of [the Victim] illustrated [defendant's] motivation in committing the first degree murder of [the Victim] and showed that [defendant] committed the first degree murder in order to further the criminal activities of his criminal street gang as alleged in the special circumstance."

## VIII.  DOCTRINE OF CUMULATIVE ERROR

Defendant argues the cumulative effect of the *Brady* error, *Napue* error, instructional error and improper admission of Santiago's testimony "led the jurors to convict [him] of murder based on insufficient evidence, speculation, and conjecture." There was no cumulative error, however. (See *People v. Johnson* (2010) 183 Cal.App.4th 253, 288.) The only error was the failure to instruct the jury with

31

CALCRIM No. 358. For the reasons discussed, however, it is not reasonably probable that this instructional error affected the outcome.

## IX. PAROLE REVOCATION FINE

The sentencing court imposed, then suspended, a parole revocation restitution fine under section 1202.45. Defendant contends that because he was sentenced to life without the possibility of parole, such a fine is improper under *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183 (*Oganesyan*). *Oganesyan* held that where a defendant receives a term of life without the possibility of parole and 15 years to life with the possibility of parole, the parole revocation restitution fine does not apply because, inter alia, "the language of section 1202.45 indicates that the overall sentence is the indicator of whether the . . . fine is to be imposed [and the section states] . . . that it is applicable to a 'person . . . whose sentence includes a period of parole.'" (*Id*. at p. 1185.) In *People v. Brasure* (2008) 42 Cal.4th 1037, 1075, the California Supreme Court held that the fine applies where the defendant received both the death sentence and an unstayed determinate term. The court distinguished *Oganesyan* on the basis that no determinate term was imposed rather, a sentence of life without the possibility of parole and an indeterminate life sentence was. (*People v. Brasure*, *supra*, at p. 1075.) Defendant points out that while he was sentenced to a determinate term for being a felon in possession of a firearm, the trial court stayed that term pursuant to section 654. Therefore, like the defendant in *Oganesyan*, "[a]t present, defendant's 'sentence' does not allow for parole." (*Oganesyan*, *supra*, at p. 1185; accord, *Carr*, *supra*, 190 Cal.App.4th at p. 482, fn. 6).

The People concede this issue and we accept their concession.

32

## X.  DISPOSITION

The matter is remanded to the trial court with directions to strike the parole revocation fine (§ 1202.45) from the sentencing minute order and abstract of judgment, and forward a corrected abstract of judgment to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

    HOLLENHORST    
Acting P. J.

We concur:

    MCKINSTER    
                J.

    CODRINGTON    
                J.